## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| DEBRA EVERETT, individually and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | CASE NO. 4:24-cv-00261 |
| v. | ) ) | |
| MEDQ, INC., | ) ) | |
| Defendant. | ) ) ) | JURY TRIAL DEMANDED |

Plaintiff Debra Everett ("Plaintiff"), individually and on behalf of all others similarly situated, upon personal knowledge of all facts pertaining to herself and on information and belief as to all other matters, by and through the undersigned counsel, bring this Class Action Complaint against Defendant medQ, Inc. ("medQ" and/or "Defendant").

### NATURE OF THE ACTION

64.    Plaintiff brings this class action lawsuit against Defendant for its failure to safeguard and protect Plaintiff's and Class's highly sensitive personally identifiable information ("PII") and protected health information ("PHI"). As a result of Defendant's failure to implement adequate data security, the highly sensitive PII and PHI of approximately 54,353 individuals, including their names, Social Security numbers, Driver's License numbers, dates of birth, health information, subscriber ID numbers, diagnoses, lab results, medications, other treatment information, health insurance and claim information, provider names, and dates of treatment (collectively, "Personal Information") were stolen by an unauthorized person between December 20, 2023 through December 26, 2023 (the "Data Breach" or "Breach")[1].

---

[1] Personally identifiable information ("PII") generally incorporates information that can be used to distinguish or trace an individual's identity, either alone or when combined with other personal

Now, Plaintiff and the Class are at an imminent and impending risk of harm for the rest of their lives.

65.    Defendant acquired, collected, and stored Plaintiff's and Class Members' Personal Information in connection with the services it provided. Therefore, at all relevant times, Defendant knew or should have known that Plaintiff's and Class Members' sensitive data, including their highly confidential PII/PHI would be stored on Defendant's networks.

66.    By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' PII/PHI, Defendant assumed legal and equitable duties to those individuals to protect and safeguard that information from unauthorized access and intrusion.

67.    Defendant had legal obligations and duties created by HIPAA, contract, industry standards, common law, and representations made to Class Members, to keep Class Members' PII/PHI confidential and to protect it from unauthorized access and disclosure.

68.    Defendant failed to adequately protect Plaintiff's and Class Members' PII/PHI and failed to even encrypt or redact this highly sensitive information. This unencrypted, unredacted PII/PHI was compromised due to medQ's negligent and/or careless acts and omissions and its utter failure to protect the sensitive data it collected for its own pecuniary gain.

69.    Had Defendant adequately designed, implemented, and monitored its network and servers, the Data Breach would have been prevented.

---

or identifying information. 2 C.F.R. § 200.79. At a minimum, it includes all information that on its face expressly identifies an individual. PII also is generally defined to include certain identifiers that do not on its face name an individual, but that are considered to be particularly sensitive and/or valuable if in the wrong hands (for example, Social Security numbers, passport numbers, driver's license numbers, financial account numbers, etc.).

CLASS ACTION COMPLAINT                                      Page 2 of 33

70.    Had Plaintiff and Class Members known that Defendant's data security was below industry standards, Plaintiff and Class Members would not have provided their PII/PHI to Defendant or relied on Defendant to protect that information.

71.    As a result of medQ's inadequate data security practices that resulted in the Data Breach, Plaintiff and Class Members are at an imminent risk of identity theft and have suffered numerous actual and concrete injuries and damages, including: (a) invasion of privacy; (b) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (c) the loss of benefit of the bargain; (d) diminution of value of their PII/PHI; and (e) the continued risk to their PII/PHI, which remains in the possession of Defendant, and which is subject to further breaches, so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' PII/PHI.

72.    medQ failed to offer any meaningful assistance to consumers to help deal with the fraud that has and will continue to result from the Data Breach. In contrast to what has been frequently made available to consumers in other data breaches, Defendant has not offered or provided any fraud insurance and only offered basic identity monitoring services for one year.

73.    Moreover, The Data Breach was a direct result of Defendant's failure to implement adequate and reasonable cybersecurity procedures and protocols necessary to protect consumers' PII/PHI. Despite discovering the Data Breach on December 26, 2023, Defendant inexplicably failed to provide notice to impacted customers until February 23, 2024. As a result, Defendant left a significant gap of time in which, unbeknownst to its customers, Defendant knew of and could have notified its customers of the Data Breach and advised its customers to take immediate remedial steps. Instead, Defendant left its customers exposed for nearly two months.

74.     Plaintiff and the class members seek to recover damages caused by Defendant's negligence, negligence per se, breach of fiduciary duty, breach of implied contract, and unjust enrichment. Additionally, Plaintiff seeks declaratory and injunctive relief as a result of Defendant's conduct, as discussed herein.

**PARTIES**

A.     **Plaintiff**

75.     Plaintiff Debra Everett is a natural person and citizen and resident of Fort Valley, Georgia.

76.     Plaintiff was provided administrative services from medQ through her medical and/or healthcare providers.

77.     In exchange for receiving medical care, Defendant was provided Plaintiff's PII/PHI as a regular part of Defendant's business operations.

78.     On February 23, 2024, medQ mailed Plaintiff a letter to notify her of the Data Breach and the impact to her PI/PHI. This Notice Letter stated that unauthorized actors gained access to and acquired files on Defendant's network, which included Plaintiff's PII. The comprised files contained her name, Social Security number, Driver's License numbers, date of birth, health information, subscriber ID numbers, diagnoses, lab results, medications, other treatment information, health insurance and claim information, provider names, and dates of treatment.

79.     Since learning of the Data Breach, Plaintiff has spent significant time in response to the Data Breach. She has spent time changing passwords on her accounts and monitoring her credit reports for unauthorized activity, which may take years to discover and detect.

80.     Plaintiff plans on taking additional time-consuming but reasonable and necessary steps to help mitigate the harm caused by the Data Breach, including continually reviewing her credit reports for unauthorized activity.

CLASS ACTION COMPLAINT                                        Page 4 of 33

81.     As a result of Defendant's conduct and omissions, Plaintiff suffered actual damages including, without limitation, time and expenses related to monitoring his financial accounts for fraudulent activity, facing an increased and imminent risk of fraud and identity theft, the lost value of his personal information, and other economic and non-economic harm. Plaintiff and Class Members will now be forced to expend additional time to review their credit reports and monitor their medical records for fraud or identify theft – particularly since the compromised information includes Social Security numbers.

82.     The Data Breach has also caused Plaintiff to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has not been forthright about the cause and full scope of the PII/PHI compromised in the Data Breach.

83.     As a result of the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

84.     Plaintiff has a continuing interest in ensuring that his PII/PHI, which, upon information and belief, remains in medQ's possession, is protected and safeguarded from future breaches.

**B.     <u>Defendant</u>**

85.     Defendant medQ, Inc. is a corporation headquartered in Texas, with its principal place of business at 3820 American Drive, Suite 160, Plano, Texas 75075. It may be served through its registered agent Corporate Creations Network, 544 Westheimer #1000, Houston, Texas 77056.

86.     medQ is a healthcare software company in Texas which provides imaging software and service solutions to physicians, physician partnerships, ancillary providers, and healthcare facilities.

CLASS ACTION COMPLAINT                                                    Page 5 of 33

## JURISDICTION AND VENUE

87.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332, as amended by the Class Action Fairness Act of 2005, because the matter in controversy exceeds $5 million, exclusive of interests and costs, , there are more than 100 members in the proposed class, and is a class action in which some members of the class are citizens of states different than Defendant medQ.

88.    As previously stated, Defendant medQ, Inc. is a corporation headquartered in Texas and has its principal place of business in Texas. Defendant also has sufficient minimum contacts in Texas and has intentionally availed themselves of this jurisdiction by marketing and selling products and services and by accepting and processing payments for those products and services within Texas.

89.    Venue properly lies in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events that gave rise to Plaintiff's claims took place within the Eastern District of Texas, and Defendant does business and has its headquarters and principal place of business there.

## FACTUAL ALLEGATIONS

90.    Plaintiff and the proposed Class are consumers of medQ. medQ is healthcare software company which provides imaging software and service solutions to physicians, physician partnerships, ancillary providers, and healthcare facilities

91.    As noted above, Plaintiff brings this class action against medQ for its failure to properly secure and safeguard personally indefinable information, for failing to comply with industry standards to protect and safeguard that information, and for failing to provide timely, accurate, and adequate notice to Plaintiff and other members of the class that such information has been compromised.

CLASS ACTION COMPLAINT                                                                 Page 6 of 33

A.    **medQ was obligated to safely protect its customers PII/PHI.**

92.    Plaintiff and Class Members provided their PII/PHI to medQ with the reasonable expectation and mutual understanding that medQ would comply with its obligations to keep such information confidential and secure from unauthorized access.

93.    Plaintiff and Class Members' PII/PHI was provided to medQ in conjunction with the type of work medQ does in providing administrative services to healthcare entities.

94.    In receiving the PII/PHI as part of its services, medQ assented and undertook legal duties to safeguard and protect the PII/PHI entrusted to them by Plaintiff and Class Members, in compliance with all applicable laws, including HIPAA.

95.    medQ's data security obligations were particularly important given the substantial increase in cyber-attacks and/or data breaches preceding the date they disclosed the incident.

96.    However, medQ failed to secure the PII/PHI of the individuals that provided them with this sensitive information.

B.    **The medQ Data Breach**

97.    Third-party unauthorized persons conducted a successful breach whereby they infiltrated Defendant's inadequately protected servers and gained unauthorized access to the confidential Personal Information of thousands of individuals whose data was stored within Defendant's systems.

98.    According to medQ, on December 26, 2023, it discovered that a cybersecurity incident had taken place in which files were encrypted by an unauthorized actor on certain servers used by its software platform (the "medQ Platform") and hosted by a third-party data center.

99.    After an investigation, medQ learned that "some files were copied by an unauthorized third party from the medQ Platform" between December 20, 2023, through

CLASS ACTION COMPLAINT                                    Page 7 of 33

December 26, 2023. In other words, Plaintiff's and the Class's PII and PHI was stolen in the Data Breach.

100.    These cybercriminals had nearly one week of unauthorized access to Plaintiff's and the Class's Personal Information that went unchecked and unnoticed.

101.    Upon information and belief, the PII/PHI contained in the files accessed by cybercriminals was not encrypted or inadequately encrypted, as the threat actors were able to acquire and steal Plaintiff's and Class Members' PII/PHI.

102.    Despite learning of the Data Breach in December 2023, Defendant did not begin to notify victims of the Data Breach until late February 2024.  This is in direct violation of their posted privacy policy[2], which states:

> In order to be in line with Fair Information Practices we will take the following responsive action, should a data breach occur:
> We will notify you via email
> • Within 7 business days
> We will notify the users via in-site notification
> • Within 1 business day

103.    The types of Personal Information accessed and copied by the unauthorized person(s) included PII and PHI, such as names, Social Security numbers, Driver's License numbers, dates of birth, health information, subscriber ID numbers, diagnoses, lab results, medications, other treatment information, health insurance and claim information, provider names, and dates of treatment.

104.    Upon information and belief, the unauthorized third-party cybercriminal(s) gained access to the Personal Information and engaged in (and will continue to engage in) misuse of the Personal Information, including marketing and selling Plaintiff's and Class members' Personal Information on the dark web.

---

[2] https://www.medq.com/privacy-policy/ (last accessed 3/25/2024)

CLASS ACTION COMPLAINT                                    Page 8 of 33

105.    Plaintiff and Class Members' Personal Information was provided to Defendant with the reasonable expectation and mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

106.    Accordingly, Defendant had obligations created by HIPAA, reasonable industry standards, common law, statutory law, and its own assurances and representations to keep Plaintiff's and Class members' Personal Information confidential and to protect such Personal Information from unauthorized access.

107.    Defendant's Privacy Policy states "Your personal information is contained behind secured networks and is only accessible by a limited number of persons who have special access rights to such systems, and are required to keep the information confidential. In addition, all sensitive/credit information you supply is encrypted via Secure Socket Layer (SSL) technology."[3]

108.    Nevertheless, Defendant failed to spend sufficient resources on preventing external access, detecting outside infiltration, and training their employees to identify threats and defend against them.

109.    The stolen Personal Information at issue has great value to the hackers, due to the large number of individuals affected and the fact that health insurance information and Social Security numbers were part of the data that was compromised.

110.    medQ failed to take appropriate or even the most basic steps to protect the PII/PHI of Plaintiff and other class members from being disclosed. PII/PHI.

**C.    <u>Defendant had an Obligation to Protect Personal Information Under the Law and the Applicable Standard of Care.</u>**

---

[3] https://www.medq.com/privacy-policy/ (last accessed 3/25/2024)

48.     Upon information and belief, Defendant is covered by HIPAA (45 C.F.R. § 160.102). As such, it is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

49.     HIPAA's Privacy Rule or *Security Standards for the Protection of Electronic Protected Health Information* establishes a national set of security standards for protecting health information, including health information that is kept or transferred in electronic form.

50.     HIPAA requires Defendant to "comply with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302.

51.     "Electronic protected health information" is "individually identifiable health information … that is (i) transmitted by electronic media; maintained in electronic media." 45 C.F.R. § 160.103.

52.     HIPAA's Security Rule requires Defendant to do the following:

   a.   Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits;

   b.   Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

   c.   Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

   d.   Ensure compliance by their workforce.

CLASS ACTION COMPLAINT                                                    Page 10 of 33

53.     HIPAA also requires Defendant to "review and modify the security measures implemented… as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. §164.306(e).

54.     Additionally, HIPAA requires Defendant to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

55.     The HIPAA Breach Notification Rule, 45 C.F.R. §§164.400-414, further requires Defendant to provide notice of the Data Breach to each affected individual "without unreasonable delay and in no case later than 60 days following discovery of the breach."

56.     Defendant was also prohibited by the Federal Trade Commission Act (the "FTC Act") (15 U.S.C. § 45) from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission (the "FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

57.     Defendant is further required by various states' laws and regulations to protect Plaintiff's and Class members' Personal Information.

58.     Defendant owed a duty to Plaintiff and the Class to design, maintain, and test its computer and email systems to ensure that the Personal Information in its possession was adequately secured and protected.

59.     Defendant owed a duty to Plaintiff and the Class to create and implement reasonable data security practices and procedures to protect the Personal Information in their

possession, including adequately training its employees (and others who accessed Personal Information within its computer systems) on how to adequately protect Personal Information.

60.    Defendant owed a duty to Plaintiff and the Class to implement processes that would detect a breach on its data security systems in a timely manner.

61.    Defendant owed a duty to Plaintiff and the Class to act upon data security warnings and alerts in a timely fashion.

62.    Defendant owed a duty to Plaintiff and the Class to disclose if their computer systems and data security practices were inadequate to safeguard individuals' Personal Information from theft because such an inadequacy would be a material fact in the decision to entrust Personal Information with Defendant.

63.    Defendant owed a duty to Plaintiff and the Class to disclosure in a timtely and accurate manner when data breaches occurred.

64.    Defendant owed a duty of care to Plaintiff and the Class because they were foreseeable and probable victims of any inadequate data security practices.

**D.    Plaintiff and the class members have suffered as a result of the Data Breach.**

65.    PII/PHI is a valuable property right.[4] The value of PII/PHI as a commodity is measurable.[5] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory

---

[4] *See* Marc van Lieshout, *The Value of Personal Data*, 457 IFIP ADVANCES IN INFORMATION AND COMMUNICATION TECHNOLOGY 26 (May 2015), https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible...").

[5] *See* Robert Lowes, *Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market*, MEDSCAPE (Apr. 28, 2014), http://www.medscape.com/viewarticle/824192 (last visited January 16, 2023).

CLASS ACTION COMPLAINT                                                    Page 12 of 33

frameworks."[6] American companies are estimated to have spent over $19 billion on acquiring personal data of consumers in 2018.[7] It is so valuable to identity thieves that once PII/PHI has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years.

66.    Personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[8] All-inclusive health insurance dossiers containing sensitive health insurance information, names, addresses, telephone numbers, email addresses, SSNs, and bank account information, complete with account and routing numbers, can fetch up to $1,200 to $1,300 each on the black market.[9] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[10] According to a report released by the Federal Bureau of Investigation's ("FBI") Cyber Division, criminals can sell healthcare records for 50 times the price of a stolen Social Security or credit card number.[11]

---

[6] *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD 4 (Apr. 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en.

[7] *U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017*, INTERACTIVE ADVERTISING BUREAU (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/.

[8] Anita George, *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/.

[9] Adam Greenberg, *Health insurance credentials fetch high prices in the online black market*, SC MAGAZINE (July 16, 2013), https://www.scmagazine.com/news/breach/health-insurance-credentials-fetch-high-prices-in-the-online-black-market.

[10]    *In the Dark*, VPNOverview.com, 2019, https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last accessed on January 16, 2023).

[11] *See Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain*, FBI CYBER DIVISION (Apr. 8, 2014), https://www.illuminweb.com/wp-content/uploads/ill-mo-uploads/103/2418/health-systems-cyber-intrusions.pdf.

67.    Stolen PII is one of the most valuable commodities on the criminal information black market. According to Experian, a credit-monitoring service, stolen PII can be worth up to $1,000.00 depending on the type of information obtained.[12]

68.    The value of Plaintiff's and the proposed Class's PII on the black market is considerable. Stolen PII trades on the black market for years, and criminals frequently post stolen private information openly and directly on various "dark web" internet websites, making the information publicly available, for a substantial fee of course.

69.    It can take victims years to spot or identify PII theft, giving criminals plenty of time to milk that information for cash.

70.    One such example of criminals using PII for profit is the development of "Fullz" packages.[13]

71.    Cyber-criminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of

---

[12] Brian Stack, *Here's How Much Your Personal Information Is Selling for on the Dark Web*, EXPERIAN (Dec. 6, 2017) https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/.

[13] "Fullz" is fraudster-speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record or more on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz", which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.*, Brian Krebs, *Medical Records For Sale in Underground Stolen From Texas Life Insurance Firm*, KREBS ON SECURITY, (Sep. 18, 2014) https://krebsonsecurity.com/tag/fullz/.

accuracy in order to assemble complete dossiers on individuals. These dossiers are known as "Fullz" packages.

72.     The development of "Fullz" packages means that stolen PII from the Data Breach can easily be used to link and identify it to Plaintiff's and the proposed Class's phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiff and members of the proposed Class, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiff's and other members of the proposed Class's stolen PII is being misused, and that such misuse is fairly traceable to the Data Breach.

73.     Criminals can use stolen PII/PHI to extort a financial payment by "leveraging details specific to a disease or terminal illness."[14] Quoting Carbon Black's Chief Cybersecurity Officer, one recent article explained: "Traditional criminals understand the power of coercion and extortion . . . . By having healthcare information—specifically, regarding a sexually transmitted disease or terminal illness—that information can be used to extort or coerce someone to do what you want them to do."[15]

74.     Consumers place a high value on the privacy of that data. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies

---

[14]     *See*        https://www.hhs.gov/hipaa/for-professionals/breach-notification/breach-reporting/index.html.

[15] *Id.*

confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[16]

75.    Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' PII/PHI has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

76.    Indeed, cyberattacks against the healthcare industry have been common for over ten years with the Federal Bureau of Investigation ("FBI") warning as early as 2011 that cybercriminals were "advancing their abilities to attack a system remotely" and "[o]nce a system is compromised, cyber criminals will use their accesses to obtain PII." The FBI further warned that that "the increasing sophistication of cyber criminals will no doubt lead to an escalation in cybercrime."[17]

77.    Cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive to ransomware criminals… because they often have lesser IT defenses and a high incentive to regain access to their data quickly.[18]

---

[16] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior*, *An Experimental Study*, 22(2) INFORMATION SYSTEMS RESEARCH 254 (June 2011), https://www.jstor.org/

stable/23015560?seq=1.

[17] Gordon M. Snow, *Statement before the House Financial Services Committee, Subcommittee on Financial Institutions and Consumer Credit*, FBI (Sept. 14, 2011), https://archives.fbi.gov/archives/news/testimony/cyber-security-threats-to-the-financial-sector.

[18] Ben Kochman, *FBI, Secret Service Warn of Targeted Ransomware*, LAW360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware.

78.    In fact, according to the cybersecurity firm Mimecast, 90% of healthcare organizations experienced cyberattacks in the past year.[19]

79.    medQ was on notice that the FBI has recently been concerned about data security regarding entities that store certain amounts of PHI, as medQ does. In August 2014, after a cyberattack on Community Health Systems, Inc., the FBI warned companies within the healthcare industry that hackers were targeting them. The warning stated that "[t]he FBI has observed malicious actors targeting healthcare related systems, perhaps for the purpose of obtaining the Protected Healthcare Information (PHI) and/or Personally Identifiable Information (PII)."[20]

80.    Plaintiff and members of the Class, as a whole, must immediately devote time, energy, and money to: 1) closely monitor their medical statements, bills, records, and credit and financial accounts; 2) change login and password information on any sensitive account even more frequently than they already do; 3) more carefully screen and scrutinize phone calls, emails, and other communications to ensure that they are not being targeted in a social engineering or spear phishing attack; and 4) search for suitable identity theft protection and credit monitoring services, and pay to procure them.

81.    Once PII/PHI is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or contained against future misuse. For this reason, Plaintiff and the class members will need to maintain these heightened measures for years, and possibly

---

[19] *See* Maria Henriquez, *Iowa City Hospital Suffers PIIshing Attack,* SECURITY MAGAZINE (Nov. 23, 2020), https://www.securitymagazine.com/articles/93988-iowa-city-hospital-suffers-PIIshing-attack.
[20] Jim Finkle, *FBI Warns Healthcare Firms that they are Targeted by Hackers*, REUTERS (Aug. 2014), https://www.reuters.com/article/us-cybersecurity-healthcare-fbi/fbi-warns-healthcare-firms-they-are-targeted-by-hackers-idUSKBN0GK24U20140820.

their entire lives, as a result of medQ's conduct. Further, the value of Plaintiff's and class members' PI/PHI has been diminished by its exposure in the Data Breach.

82.     As a result of medQ's failures, Plaintiff and Class Members are at substantial risk of suffering identity theft and fraud or misuse of their PII/PHI.

83.     Plaintiff and the Class suffered actual injury from having PII/PHI compromised as a result of Defendant's negligent data management and resulting Data Breach including, but not limited to (a) damage to and diminution in the value of their PII/PHI, a form of property that medQ obtained from Plaintiff; (b) violation of their privacy rights; (c) present and increased risk arising from the identity theft and fraud; (d) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (e) financial "out of pocket" costs incurred mitigating the materialized risk and imminent threat of identity theft; and (f) invasion of privacy.

84.     For the reasons mentioned above, medQ's conduct, which allowed the Data Breach to occur, caused Plaintiff and members of the Class these significant injuries and harm.

85.     Plaintiff brings this class action against medQ for medQ's failure to properly secure and safeguard PII/PHI and for failing to provide timely, accurate, and adequate notice to Plaintiff and other class members that their PII/PHI had been compromised.

<u>**CLASS ACTION ALLEGATIONS**</u>

86.     Plaintiff proposes the following Class definition, subject to amendment as appropriate:

> All persons whose Personal Information or PHI was compromised in the Data Breach occurring in December 2023, including all individuals who Defendant mailed notice to on or around February 23, 2024.

87. Excluded from the Classes are medQ's officers and directors, and any entity in which medQ has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of medQ. Excluded also from the Classes are Members of the judiciary to whom this case is assigned, their families and Members of their staff.

88. Plaintiff hereby reserves the right to amend or modify the class definitions with greater specificity or division after having had an opportunity to conduct discovery.

89. <u>Numerosity</u>. The Members of the Classes are so numerous that joinder of all of them is impracticable. As noted above, there are approximately 54,353 Members.

90. <u>Commonality</u>. There are questions of law and fact common to the Classes, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

    a. Whether medQ unlawfully used, maintained, lost, or disclosed Plaintiff's and Class Members' PII/PHI;

    b. Whether medQ failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

    c. Whether medQ's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

    d. Whether medQ's data security systems prior to and during the Data Breach were consistent with industry standards;

    e. Whether medQ owed a duty to Class Members to safeguard their PII/PHI;

    f. Whether medQ breached their duty to Class Members to safeguard their PII/PHI;

    g. Whether computer hackers obtained Class Members' PII/PHI in the Data Breach;

h.   Whether medQ knew or should have known that its data security systems and monitoring processes were deficient;

i.   Whether medQ's conduct was negligent;

j.   Whether medQ's acts, inactions, and practices complained of herein amount to acts of intrusion upon seclusion under the law;

k.   Whether medQ's acts breaching an implied contract they formed with Plaintiff and the Class Members;

l.   Whether medQ violated the Federal Trade Commission Act ("FTC Act");

m.   Whether medQ violated the Health Insurance Portability and Accountability Act ("HIPAA");

n.   Whether medQ was unjustly enriched to the detriment of Plaintiff and the Class;

o.   Whether medQ failed to provide notice of the Data Breach in a timely manner; and

p.   Whether Plaintiff and Class Members are entitled to damages, civil penalties, punitive damages, and/or injunctive relief.

91.   <u>Typicality</u>. Plaintiff's claims are typical of those of other Class Members because Plaintiff's PII/PHI, like that of every other Class Member, was compromised in the Data Breach.

92.   <u>Adequacy of Representation</u>. Plaintiff will fairly and adequately represent and protect the interests of the Members of the Class. Plaintiff's Counsel are competent and experienced in litigating class actions, including data privacy litigation of this kind.

93.   <u>Predominance</u>. medQ has engaged in a common course of conduct toward Plaintiff and Class Members, in that all the Plaintiff's and Class Members' data was stored on the same computer systems and unlawfully accessed in the same way. The common issues arising from medQ conduct affecting Class Members set out above predominate over any individualized issues.

CLASS ACTION COMPLAINT                                         Page 20 of 33

Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

94.     Superiority. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for medQ. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

95.     medQ has acted on grounds that apply generally to the Classes as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

96.     Likewise, particular issues under are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

> a.   Whether medQ owed a legal duty to Plaintiff and the Classes to exercise due care in collecting, storing, using, and safeguarding their PII/PHI;
>
> b.   Whether medQ's data security practices were reasonable in light of best practices recommended by data security experts;

CLASS ACTION COMPLAINT                                          Page 21 of 33

c.  Whether medQ's failure to institute adequate protective security measures amounted to negligence;

d.  Whether medQ failed to take commercially reasonable steps to safeguard consumer PII/PHI; and

e.  Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

97.     Finally, all members of the proposed Classes are readily ascertainable. medQ has access to Class Members' names and addresses affected by the Data Breach. At least some Class Members have already been preliminarily identified and sent notice of the Data Breach by medQ.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE

98.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

99.     medQ owed a duty to Plaintiff and all other Class members to exercise reasonable care in safeguarding and protecting their PII/PHI in their possession, custody, or control.

100.    medQ knew, or should have known, the risks of collecting and storing Plaintiff's and all other Class members' PII/PHI and the importance of maintaining secure systems. medQ knew, or should have known, of the vast uptick in data breaches in recent years. medQ had a duty to protect the PII/PHI of Plaintiff and Class Members.

101.    Given the nature of medQ's business, the sensitivity and value of the PII/PHI it maintains, and the resources at its disposal, medQ should have identified the vulnerabilities to its systems and prevented the Data Breach from occurring, which medQ had a duty to prevent.

102.    medQ breached these duties by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII/PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect PII/PHI entrusted to it—including Plaintiff's and Class members' PII/PHI.

103.    It was reasonably foreseeable to medQ that its failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII/PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems would result in the unauthorized release, disclosure, and dissemination of Plaintiff's and Class members' PII/PHI to unauthorized individuals.

104.    But for medQ's negligent conduct or breach of the above-described duties owed to Plaintiff and Class members, their PII/PHI would not have been compromised.

105.    As a result of medQ's above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiff and all other Class Members have suffered, and will continue to suffer, economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantially increased risk of identity theft and medical theft— risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their PII/PHI; (iii) breach of the confidentiality of their PII/PHI; (iv) deprivation of the value of their PII/PHI, for which there is a well-established national and international market; (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face; and (vii) actual or attempted fraud.

## COUNT II
## NEGLIGENCE PER SE

106.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

107.    medQ's duties arise from, in part due to its storage of certain medical information, *inter alia*, the HIPAA Privacy Rule ("Standards for Privacy of Individually Identifiable Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and E, and the HIPAA Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C (collectively, "HIPAA Privacy and Security Rules").

108.    TMLT's duties also arise from Section 5 of the FTC Act ("FTCA"), 15 U.S.C. § 45(a)(1), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, the unfair act or practice by a business, such as medQ, of failing to employ reasonable measures to protect and secure PII/PHI.

109.    medQ's duties further arise from the Health Insurance Portability and Accountability Act of 1996 (HIPAA), 42 U.S.C. § 1302(d), *et seq.*

110.    medQ is an entity covered under HIPAA, which sets minimum federal standards for privacy and security of PHI.

111.    medQ violated HIPAA Privacy and Security Rules and Section 5 of the FTCA by failing to use reasonable measures to protect Plaintiff's and all other Class members' PII/PHI and not complying with applicable industry standards. medQ's conduct was particularly unreasonable given the nature and amount of PII/PHI it obtains and stores, and the foreseeable consequences of a data breach involving PII/PHI including, specifically, the substantial damages that would result to Plaintiff and the other Class members.

112.    medQ's violations of HIPAA Privacy and Security Rules and Section 5 of the FTCA constitutes negligence per se.

113.    Plaintiff and Class members are within the class of persons that HIPAA Privacy and Security Rules and Section 5 of the FTCA were intended to protect.

114.    The harm occurring because of the Data Breach is the type of harm HIPAA Privacy and Security Rules and Section 5 of the FTCA were intended to guard against.

115.    It was reasonably foreseeable to medQ that its failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII/PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems, would result in the release, disclosure, and dissemination of Plaintiff's and Class members' PII/PHI to unauthorized individuals.

116.    The injury and harm that Plaintiff and the other Class members suffered was the direct and proximate result of medQ's violations of HIPAA Privacy and Security Rules and Section 5 of the FTCA. Plaintiff and Class members have suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantially increased risk of identity theft and medical theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their PII/PHI; (iii) breach of the confidentiality of their PII/PHI; (iv) deprivation of the value of their PII/PHI, for which there is a well-established national and international market; (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face; and (vi) actual or attempted fraud.

## COUNT III
## BREACH OF THIRD-PARTY BENEFICIARY CONTRACT

117.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

118.    Plaintiff and Class Members are intended third-party beneficiaries of a contract entered into between Defendant and the healthcare entities (the "Healthcare Entities") Defendant serviced (the "contracting parties"). This included a contract entered into before the Data Breach to provide administrative services and securily store Plaintiff's and the Class Members' PII/PHI that Defendant obtained from the Healthcare Entities it serviced (the "Contract").

119.    Upon information and belief, that respective contract contained provisions requiring Defendant to protect the PII/PHI that the Healthcare Entities received and in turn, disclosed to Defendant, in order to provide services to the Healthcare Entities.

120.    Upon information and belief, those provisions requiring Defendant to protect and PII/PHI it received from the Healthcare Entities were intentionally included for the direct benefit of Plaintiff and Class Members, such that Plaintiff and Class members are intended third-party beneficiaries of this contract and are therefore entitled to enforce them.

121.    Plaintiff and Class Members would not have provided their PII/PHI to medQ had they known that medQ would not safeguard their PII/PHI, as promised, or provide timely notice of a data breach.

122.    Plaintiff and Class Members fully performed their obligations under their contracts with medQ.

123.    Defendant breached the contract by not safeguarding Plaintiff and Class Members' PII/PHI and not utilizing adequate data security, as described herein, resulting in the Data Breach.

124.    Exposure, breach and idenfity theft were the expected risks both contracting parties could forsee from the improper performance of the Contract.

125.    The injuries suffered by Plaintiff and Class Members were the kind of injuries that proper performance was intended to prevent.

126.    As a direct and proximate result of Defendant's breaches, Plaintiff and Class Members sustained actual losses and damages as described herein.

127.    Accordingly, Plaintiff and Class Members are entitled to damages in an amount to be determined at trial.

**COUNT IV**
**UNJUST ENRICHMENT**

128.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

129.    This claim is pled in the alternative to the implied contract claim pursuant to Fed. R. Civ. P. 8(d).

130.    Plaintiff and Class Members conferred a monetary benefit upon medQ in the form of monies paid for healthcare administrative services or other services.

131.    medQ accepted or had knowledge of the benefits conferred upon it by Plaintiff and Class Members. medQ also benefitted from the receipt of Plaintiff's and Class Members' PII/PHI.

132.    As a result of medQ's conduct, Plaintiff and Class Members suffered actual damages in an amount equal to the difference in value between their payments made with reasonable data privacy and security practices and procedures that Plaintiff and Class Members paid for, and those payments without reasonable data privacy and security practices and procedures that they received.

133.    medQ should not be permitted to retain the money belonging to Plaintiff and Class Members because medQ failed to adequately implement the data privacy and security procedures

for itself that Plaintiff and Class Members paid for and that were otherwise mandated by federal, state, and local laws. and industry standards.

134.    medQ should be compelled to provide for the benefit of Plaintiff and Class Members all unlawful proceeds received by it as a result of the conduct and Data Breach alleged herein.

**COUNT V**
**DECLARATORY RELIEF**

135.    Plaintiff realleges and incorporates by reference all proceding paragraphs as if fully set forth herein.

136.    This count is brought under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201.

137.    As previously alleged, Defendant entered into contracts which required Defendant to provide adequate security for the PII/PHI collected from Plaintiff and the Class.

138.    Defendant owed, and still owes, a duty of care to Plaintiff and Class Members that require it to adequately secure Plaintiff's and Class Members' PII/PHI.

139.    Upon information and belief, Defendant still possesses the PII/PHI of Plaintiff and the Class Members.

140.    Defendant has not satisfied its contractual obligations and legal duties to Plaintiff and the Class Members.

141.    Since the Data Breach, Defendant has not substantively addressed any changes to its data security infrastructure, processes, or procedures to fix the vulnerabilities in its computer systems and/or security practices which permitted the Data Breach to occur and go undetected and, thereby, prevent further attacks.

142.    Defendant has not satisfied its contractual obligations and legal duties to Plaintiff and the Class. In fact, now that Defendant's insufficient data security is known to hackers, the PII/PHI in Defendant's possession is even more vulnerable to cyberattack.

143.    Actual harm has arisen in the wake of the Data Breach regarding Defendant's contractual obligations and duties of care to provide security measures to Plaintiff and the members of the Class. Further, Plaintiff and the members of the Class are at risk of additional or further harm due to the exposure of their PII/PHI and Defendant's failure to address the security failings that led to such exposure.

144.    There is no reason to believe that Defendant's security measures are any more adequate now than they were before the Data Breach to meet Defendant's contractual obligations and legal duties.

145.    Plaintiff and the Class, therefore, seek a declaration (1) that Defendant's existing security measures do not comply with its contractual obligations and duties of care to provide adequate security, and (2) that to comply with its contractual obligations and duties of care, Defendant must implement and maintain reasonable security measures, including, but not limited to:

a. Ordering that Defendant engage third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attack, penetrations tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

b. Ordering that Defendant engage third-party security auditors and internal personnel to run automated security monitoring;

CLASS ACTION COMPLAINT                                                      Page 29 of 33

    c.   Ordering that Defendant audit, test, and train its security personnel regarding any new or modified procedures;

    d.   Ordering that Defendant segment data by, among other things, creating firewalls and access controls so that if one area of Defendant's systems is compromised, hackers cannot gain access to other portions of Defendant's systems;

    e.   Order that Defendant purge, delete, and destroy, in a reasonably secure manner, customer data not necessary for their provisions of service;

    f.   Ordering that Defenant conduct regular database scanning and security checks; and

    g.   Ordering that Defenant routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach.

## JURY DEMAND

146.   Plaintiff demands a trial by jury on all claims so triable.

## PRAYER

WHEREFORE, Plaintiff, individually and on behalf of the Class, pray for judgment as follows:

    a.   For an Order certifying this action as a class action and appointing Plaintiff and her counsel to represent the Class;

    b.   For equitable relief enjoining medQ from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class Members' PII/PHI;

    c.   For equitable relief compelling medQ to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety, and to disclose with specificity the type of PII/PHI compromised during the

CLASS ACTION COMPLAINT                           Page 30 of 33

Data Breach;

d.     For an order requiring medQ to pay for credit monitoring services for Plaintiff and the Class of a duration to be determined at trial;

e.     For an order providing injunctive relief and other equitable relief as necessary to protect the interests of the Class and the general public as required herein, including, but not limited to:

         i.     Ordering that Defendant engage third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

         ii.     Ordering that Defendant engage third-party auditors and internal personnel to run automated security monitoring;

         iii.     Ordering that Defendant audit, test, and train their security personnel regarding any new or modified procedures;

         iv.     Ordering that Defendant segment customer data by, among other things, creating firewalls and access controls so that if one area of Defendant' systems is compromised, hackers cannot gain access to other portions of Defendant' systems;

v.     Ordering that Defendant cease transmitting Personal Information via unencrypted email;

vi.    Ordering that Defendant cease storing Personal Information in email accounts;

vii.   Ordering that Defendant purge, delete, and destroy in a reasonably secure manner customer data not necessary for its provisions of services;

viii.  Ordering that Defendant conduct regular database scanning and securing checks;

ix.    Ordering that Defendant routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

x.     Ordering Defendant to meaningfully educate current, former, and prospective employees and subcontractors about the threats faced as a result of the loss of financial and personal information to third parties, as well as the steps they must take to protect against such occurrences;

f.     For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

g.     For an award of punitive damages, as allowable by law;

h.    For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

i.    Pre and post-judgment interest on any amounts awarded; and

j.    Such other and further relief as this court may deem just and proper.

Dated: March 25, 2024

Respectfully submitted,

By: /s/*Bruce W. Steckler*
**Bruce W. Steckler**
TX Bar No. 00785039
bruce@swclaw.com
**STECKLER WAYNE & LOVE, PLLC**
12720 Hillcrest Road, Suite 1045
Dallas, TX 75230
Tel:    (972) 387-4040
Fax:    (972) 387-4041

**John G. Emerson, Jr.**
TX Bar No. 06602600
jemerson@emersonfirm.com
**EMERSON FIRM, PLLC**
2500 Wilcrest, Suite 300
Houston, TX 77042
Tel:    (800) 551-8649
Fax:    (501) 286-4649

John A. Yanchunis
**MORGAN & MORGAN COMPLEX LITIGATION GROUP**
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
(813) 223-5505
jyanchunis@ForThePeople.com
Tampa, Florida 33602
(813) 223-5505
jyanchunis@ForThePeople.com

**ATTORNEYS FOR PLAINTIFF AND THE PROPOSED CLASS**

CLASS ACTION COMPLAINT